UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

---

| | |
|---|---|
| DAVID N.T. WATSON, | **AMENDED COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| - against - | **Case No.** |
| COMMUNITY EDUCATION CENTERS, INC., a Delaware corporation, and JOHN J. CLANCY, an individual, | 2:10:cv-00778-CEH-SPC |
| Defendants. | |

---

Plaintiff, DAVID N.T. WATSON ("Plaintiff"), by and through his attorneys, Peckar & Abramson, P.C., as and for his Amended Complaint against Defendants COMMUNITY EDUCATION CENTERS, INC. ("CEC") and JOHN J. CLANCY ("Clancy") (CEC and Clancy are hereafter collectively referred to as "Defendants"), hereby alleges:

### PARTIES, JURISDICTION, AND VENUE

1. This Court has proper jurisdiction over this matter on grounds of diversity of citizenship pursuant to 28 U.S.C. §1332, and given that the amount in controversy exceeds $75,000.00.

2. This Court has personal jurisdiction over each of the Defendants as they committed torts in this District. In addition, each Defendant engaged in commercial transactions taking place, at least in part, in this District, and each Defendant's conduct in those transactions is the subject of this action. Finally, to the extent that any of the Defendant's tortious acts were committed outside of this District, each Defendant knew that his acts would have consequences in this District, and each Defendant derived substantial revenue from interstate commerce.

1

3.  Venue is appropriate in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred here.

4.  At all times material hereto, Plaintiff was and is a resident of Collier County, Florida and is otherwise *sui juris*.

5.  At all times material hereto, Defendant CEC is a corporation organized under the laws of the State of Delaware which transacts business throughout the United States, including significant business in the State of Florida, and is authorized to conduct business in the State of Florida.

6.  At all times material hereto, Defendant Clancy is an individual who resides in Essex County, New Jersey, and is otherwise *sui juris*.

**FACTS COMMON TO ALL COUNTS**

7.  CEC is in the business of providing reentry treatment and education services for adult correctional populations throughout the United States.

8.  Defendant Clancy is the Chief Executive Officer ("CEO") and Chairman of the Board of CEC.

9.  Plaintiff was, until his termination, the Chief Financial Officer ("CFO") of CEC.

10. In or about 1999, Plaintiff was the Controller and Assistant Treasurer for a company called Wackenhut Corrections Corporation, which has since changed its name to The GEO Group, Inc. ("GEO").

11. In or about 1999, Clancy approached Plaintiff by contacting him by telephone in Florida, and offered a job to Plaintiff to serve as the Chief Financial Officer of CEC. Plaintiff turned down the job offer at that time.

12. During the ensuing eight years, Plaintiff advanced to the position of Treasurer and Vice President of Finance at GEO.

13. In 2007, Plaintiff left GEO to become the Executive Vice President and Chief Financial Officer of a publicly traded company called Radiation Therapy Services, Inc. ("RTSI").

14. Shortly after joining RTSI, in or about 2007, Clancy again approached Plaintiff by telephoning him in Florida and asked if Plaintiff was interested in joining CEC, this time as a member of its Board of Directors. Again, Plaintiff declined the offer.

15. In late spring 2009, Clancy made further contact with Plaintiff by telephoning him in Florida, at which time Clancy offered Plaintiff the position of Senior Vice President and Chief Financial Officer of CEC.

16. In connection with Clancy's and CEC's offer, and in order to induce Plaintiff to accept a position with CEC, Clancy made material misrepresentations concerning the financial condition of CEC and its viability as a going concern and player in the relevant industry.

17. In this regard, on or about July 16, 2009, Plaintiff had a meeting with Defendant Clancy at the Miramar Lakes Clubhouse in Miramar Lakes, Florida, to further discuss the position being offered, and CEC's finances and prospects.

18. During these discussions, Clancy told Plaintiff that CEC had increased its debt load in 2007 to complete an acquisition, expand several facilities and build a new facility with the goal of completing an initial public offering ("IPO") of CEC in 2008. Clancy told Plaintiff that CEC had run a dual-track process in 2008 and ultimately settled on a sale of the company, but that the sale fell through because the buyer was unable to obtain financing. Clancy further told Plaintiff that the expansion beds in CEC's facilities did not fill as anticipated because of the

economic downturn, which purportedly caused the company to fail its debt covenants in early 2009.

19. In or about July, 2009, Plaintiff was specifically told by Defendant Clancy that the default had been cured earlier in the summer of 2009 by an amendment to the company's credit agreement. At this time, Clancy further told Plaintiff that the credit agreement was no longer an issue and the outlook for the company was very good. However, Clancy's statement were false in that the company was about to default on the credit agreement and the financial outlook was not favorable for meeting the company's internal projections.

20. Plaintiff was told by Clancy that his role would be to improve the company's accounting function and prepare it for an IPO or other capital raising event in mid 2010.

21. In connection with these negotiations, Defendants furnished Plaintiff with numerous financial documents, including draft audited financial statements for 2008, detailed bid summaries prepared by Bank of America, JP Morgan, and Avondale Partners from 2008 negotiations, reports of auditors, May 2009 financial statements, industry reports, and detailed analyses of financing opportunities for CEC.

22. On or about July 14, 2009, Defendants provided Plaintiff with a draft employment agreement.

23. In early August 2009, Defendants provided Plaintiff with a term sheet concerning a proposed purchase and lease of several of CEC's correctional facilities, and an analysis of the financial impact of a potential sale-leaseback of company facilities in conjunction with an IPO, prepared by a national bank.

24. On or about August 19, 2009, and before Plaintiff even signed an employment agreement, CEC's General Counsel, Debra Shannon ("Shannon"), approached Plaintiff requesting to post Plaintiff's resume to Intralinks.

25. In consideration of, and in reliance upon the promises, and financial representations by CEC, Clancy, and others at CEC, Plaintiff agreed to resign his position with RTSI and accepted the position of Senior Vice President and CFO at CEC. In this regard, on or about September 14, 2009, Plaintiff entered into an employment agreement with CEC (the "Employment Agreement").

26. Shortly after commencing his employment with CEC, however, Plaintiff discovered that CEC's true financial picture had been hidden from him, and that Defendants had grossly misstated the true status of its financial affairs, and failed to disclose that its financial situation was dire at the precise time they were negotiating the Employment Agreement with Plaintiff. Specifically, Clancy failed to disclose the likelihood that CEC would not be able to comply with its debt covenant because the projections used by Clancy and others at the company were obviously not going to be achieved based on actual market performance information available to Clancy and others at CEC where the census levels showed lack of occupancy for several key facilities.

27. Almost immediately after Plaintiff joined CEC, the company defaulted on its amended credit facility.

28. When CEC defaulted on its amended credit facility, Plaintiff learned that most of the finance people and senior management knew, and had known, that the projections used to set the covenant levels in the amended credit facility were overstated.

29. Upon information and belief, Defendant Clancy took action to inflate the projections used to set the covenant levels, which ultimately led to a default of the amended credit facilities shortly after Plaintiff joined the company.

30. As evidence that Defendants knew of the precarious financial condition of the company and failed to disclose that information to Plaintiff, CEC's Controller Ms. Kirsten DaSilva stated to Plaintiff, shortly after he started at CEC, that the former CFO had anticipated that the company would default on the new agreement by August of 2009.

31. CEC lasted longer than Defendants had anticipated, and defaulted in late September 2009, shortly after Plaintiff began his employment and when CEC issued its August 2009 financial data.

32. Despite this enormous setback; the fact that it was now obvious that Plaintiff had been fraudulently induced to leave a lucrative executive position to join the proverbial "sinking ship;" and the quite obvious fact that the company was nowhere near being in a financial position to position itself for an IPO and potential sale, Plaintiff diligently went to work to help repair CEC's finances and stabilize the company.

33. Thereafter, for a period of over fourteen (14) months, Plaintiff worked diligently to spearhead a team of individuals whose task was to rightsize the company and secure first and second lien credit facilities on terms that would permit the company to continue to operate as a viable concern.

34. At the same time, Plaintiff actively attempted to relocate from Florida to northern New Jersey. As part of the original Employment Agreement, Paragraph 3(e), Plaintiff agreed to relocate to northern New Jersey within nine (9) months of the Effective Date of the Employment Agreement (*ie.*, by June 19, 2010).

35. Plaintiff and Defendants later mutually agreed to modify the Employment Agreement by addendum (the "Addendum to Agreement"), and allow 18 months from the Effective Date of the Employment Agreement to relocate to northern New Jersey (*ie.*, by March 19, 2011).

36. In accordance with Paragraph 3(e) of the Employment Agreement, both as originally stated and as later modified by the Addendum to Agreement, and well within the time period provided in each, in September 2009, Plaintiff identified and made an offer to purchase a home in northern New Jersey.

37. In October 2009, however, both Shannon and Mike Pelletier, the Senior Vice President for Administration and Operational Support at CEC, advised Plaintiff that, due to CEC's financial difficulties, it would not be a good idea for Plaintiff to move his family to northern New Jersey.

38. Paragraph 3(b) of the original Employment Agreement also called for Plaintiff to receive a target bonus for 2009 in the sum of $175,000. While not guaranteed, the Employment Agreement called for Defendants to make a good faith effort to satisfy the target.

39. In the Addendum to Agreement, Plaintiff and Defendants agreed to modify the Employment Agreement to provide, among other things, that Plaintiff was entitled to be paid the entire 2009 bonus of $175,000 upon execution of the Addendum to Agreement. The Addendum to Agreement was executed on or about March 24, 2010, and Defendants paid the bonus shortly thereafter.

40. Just prior to the parties negotiating the Addendum to Agreement, Clancy suggested that Plaintiff defer the bonus and instead receive an increase in salary in the sum of $100,000. Plaintiff rejected this suggestion.

41. Upon information and belief, Clancy knew at the time that he offered to convert Plaintiff's vested right to a $175,000 bonus into a prospective salary increase that Plaintiff's employment at CEC would not continue long enough for Plaintiff to recover, as salary, the bonus money that he stood to lose had he agreed to Clancy's proposal, as Clancy was planning all along to improperly terminate Plaintiff's employment and ignore the provisions of the Employment Agreement.

42. In 2010, Plaintiff traveled the country for approximately two and one-half weeks seeking to secure investors for CEC.

43. Utilizing Plaintiff's efforts and abilities as CFO, CEC ultimately obtained a $235 million refinancing deal in early December, 2010.

44. Within a few short days of CEC having closed on the $235 million refinancing deal, which Defendants boldly proclaimed had served to "recapitalize[] [the] company and … provided [it] with the liquidity to expand [its] pursuit of organic growth opportunities," Plaintiff was verbally told on December 15, 2010 that his employment was to be terminated.

45. When Plaintiff demanded that Defendants provide some explanation for his termination, they made no legitimate attempt to explain their actions, nor did they provide any opportunity for Plaintiff to cure any alleged deficiencies.

46. The actions by Defendants in this regard constitute a clear violation of the Employment Agreement.

47. The Employment Agreement provides, at Section 1 entitled "Term", as follows:

> "….the term of this Agreement shall commence on the Effective Date, and shall continue thereafter for three (3) years until terminated as herein provided. The Agreement shall renew in one year (1) increments unless Notice of Termination is provided to the other party no less than six (6) months before the expiration of the then current term…."

48. In accordance with the Employment Agreement, Plaintiff's employment was to continue through September 14, 2012, and to extend automatically thereafter unless the agreement were otherwise terminated in accordance with its express terms.

49. While Section 6(c) of the Employment Agreement permits CEC to terminate Plaintiff's employment "for cause", that agreement makes clear that the term "Cause" has a very narrow definition and includes, for instance, fraud or theft; grossly negligent or willful acts; or some other material breach of the provisions of the agreement "which breach, if curable, is not cured within 30 days after written notice is delivered to the Executive specifically identifying the manner in which the Executive has failed to observe such provisions." (Employment Agreement, § 6(c)).

50. The Employment Agreement further provides, at Section 6(f) entitled "Notice of Termination", as follows:

> "Any termination of the Executive's employment by the Company.... shall be communicated by a written 'Notice of Termination' to the other party in accordance with Section 10 hereof. The Notice of Termination shall indicate the specific termination provision relied upon, if any, and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated. If during the term of the Agreement, the Company shall terminate this Agreement without cause, the Company shall give the Executive ninety (90) days prior notice...."

51. CEC never served written Notice of Termination or a Notice to Cure upon Plaintiff, and simply ignored the terms of the Employment Agreement by verbally announcing to him, on or about December 15, 2010 that his employment was being terminated, and with no legitimate explanation whatsoever.

52. CEC also did not provide Plaintiff with the required minimum 90 days' advance notice of termination.

53. Paragraph 7 of the Employment Agreement, entitled "Compensation Upon Termination" details Plaintiff's right to further compensation and benefits from CEC upon the termination of his employment by CEC.

54. CEC has failed to compensate Plaintiff in accordance with the terms of the Employment Agreement for a "without cause" termination, and has failed and refused to pay to him the wages and benefits to which he is clearly entitled under the Employment Agreement and New Jersey law, which total in excess of $1.2 million.

55. Plaintiff has retained the law firm of Peckar & Abramson to prosecute this action and is obligated to pay the firm a reasonable fee.

## COUNT ONE
### (Breach of Contract)

56. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

57. The Employment Agreement constitutes a binding contract between CEC and Plaintiff.

58. Plaintiff performed each and every obligation that he owed to CEC under the terms of the Employment Agreement.

59. CEC breached the terms of the Employment Agreement by, *inter alia*:

   a.) failing and refusing to compensate Plaintiff in accordance with the Employment Agreement; and

   b.) terminating Plaintiff's employment in violation of the termination, notice, and compensation provisions of the Employment Agreement.

60. As a direct and proximate result of CEC's breach of the terms of the Employment Agreement, Plaintiff has suffered and continues to suffer damages, in an amount to be proven at trial, together with pre-judgment interest and costs.

61. Plaintiff reserves the right to claim punitive damages against CEC at the appropriate time.

**WHEREFORE** Plaintiff David N.T. Watson demands judgment against Defendant, Community Education Services, Inc. for all damages, interest, costs of suit, attorneys' fees and such other relief as this Court deems just and proper.

## COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing)

62. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

63. Section 16 of the Employment Agreement provides that the agreement shall be governed by the laws of the State of New Jersey.

64. Under New Jersey law, a covenant of good faith and fair dealing is implied into every contract.

65. CEC's actions, as aforesaid, constitute a breach of the implied covenant of good faith and fair dealing with Plaintiff.

66. Plaintiff reserves the right to claim punitive damages against CEC at the appropriate time.

**WHEREFORE** Plaintiff David N.T. Watson demands judgment against Defendant Community Education Services, Inc. for all damages, interest, costs of suit, attorneys' fees and such other relief as this Court deems just and proper.

## COUNT THREE
### (Fraudulent Inducement)

67. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

68. As alleged in the "Facts Common to All Counts" stated above, in order to induce Plaintiff to leave secure employment and to accept a position with CEC, Defendant Clancy in his individual capacity and as a representative of CEC made material misrepresentations concerning the financial condition and viability of CEC as a going concern, and failed to disclose to Plaintiff the true financial picture of the company. Defendants misrepresentations and/or material omissions of fact include, but are not limited to the following:

   a.) Defendant Clancy misrepresented CEC's finances and prospects by failing to disclose to Plaintiff (during several telephone conversations and a face to face meeting in Miramar Lakes Clubhouse in Miramar Lakes, Florida on July 16, 2009) his knowledge and information that CEC was not going to make its financial projections and was likely to default on it amended credit facility;

   b.) Defendant Clancy misrepresented CEC's financial default had been cured in the summer of 2009 by an amendment to the company's credit agreement, but failed to disclose that it was anticipated, by CEC's former Chief Financial Officer, that CEC would default on the credit agreement as early as August 2009, something known to Defendants but speciously hidden by them from Plaintiff when the Employment Agreement was negotiated;

c.) Defendant Clancy misrepresented that the credit agreement was "no longer an issue" and that the outlook for the company was "very good," notwithstanding that it was anticipated, by CEC's former Chief Financial Officer, that CEC would default on the credit agreement as early as August 2009, something known by Defendants when they negotiated the Employment Agreement, but was hidden from Plaintiff;

d.) Defendants omitted and failed to disclose that CEC's finance people and senior management knew that the projections used to set the covenant levels in the amended credit facility were inflated;

e.) Defendant Clancy misrepresented to Plaintiff that Plaintiff's role at CEC would be to improve the company's accounting function and to prepare it for an IPO or other capital raising event in late 2010, notwithstanding that Defendants knew that CEC's troubled finances and anticipated default under the credit agreement made an IPO or sale in late 2010 impossible;

f.) Defendants omitted and failed to disclose that Plaintiff was being hired, not to improve the company's accounting function and to prepare it for an IPO, but rather to utilize his unique contacts and financial expertise to stabilize and save the "sinking ship" that was CEC, by securing first and second lien credit facilities on terms that would permit the company to continue to operate as a viable concern; and

g.) Defendants omitted and failed to disclose the details concerning CEC's complete financial picture and the fact that CEC was in dire financial

condition at the time that the Employment Agreement was being negotiated.

69. Defendants further misrepresented their intention to form a long-term and lasting business relationship with Plaintiff, when it was their unstated purpose to employ Plaintiff for only so long as was necessary to have Plaintiff repair the troubled finances of CEC.

70. Defendants further misrepresented their intention to adhere to the terms of the Employment Agreement that they prepared, tendered, negotiated, and agreed to enter into with Plaintiff, when it was their unstated purpose to terminate Plaintiff's employment as soon as he secured the necessary finances for CEC, and to violate and ignore the termination, notice, and compensation provisions of the Employment Agreement.

71. All of the foregoing misrepresentations and omissions were material to Plaintiff's decision to accept a position with CEC and to leave secure employment with RTSI.

72. At the time Defendants made these misrepresentations, it was their intention that Plaintiff rely upon these misrepresentations in deciding to leave his secure employment and to join CEC.

73. Plaintiff reasonably relied upon these misrepresentations, and Defendants' failure to disclose material facts, to his detriment.

74. As a direct and proximate result of the Defendants' misrepresentations and their failure to disclose material facts, Plaintiff has been damaged.

75. Defendants' conduct was intentional and/or reckless and, therefore, warrant an award of punitive damages to Plaintiff.

**WHEREFORE** Plaintiff David N.T. Watson demands judgment against Defendants Community Education Services, Inc. and John J. Clancy, jointly and severally, for all damages,

interest, costs of suit, attorneys' fees, punitive damages and such other relief as this Court deems just and proper.

## COUNT FOUR
### (Promissory Estoppel)

76. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

77. Defendants made clear and definite promises to Plaintiff, in the Employment Agreement, that his employment was to continue through at least September 14, 2012.

78. Defendants made clear and definite promises to Plaintiff, in the Employment Agreement, that they would only terminate him prior to that date for cause, as the term is defined in the Employment Agreement, or, if they terminated him without cause, that Plaintiff would receive 90 days' prior notice, and full compensation.

79. Defendants also made clear and definite promises to Plaintiff concerning the finances and prospects of CEC as a going concern.

80. Defendants made these promises with the expectation that Plaintiff would rely on them in deciding to leave his prior employment, accept a position with CEC, and enter into the Employment Agreement with the Defendants.

81. Plaintiff reasonably relied on these promises when he decided to terminate his prior employment with RTSI, accept a position with CEC, and enter into an Employment Agreement with Defendants in September 2009.

82. As a result of his reliance, Plaintiff has suffered a definite and substantial detriment including lost employment, wages, and benefits, and damage to his business reputation.

83. Defendants' conduct was intentional and/or reckless and, therefore, warrant an award of punitive damages to Plaintiff.

15

**WHEREFORE** Plaintiff David N.T. Watson demands judgment against Defendants Community Education Services, Inc. and John J. Clancy, jointly and severally, for all damages, interest, costs of suit, attorneys' fees, punitive damages and such other relief as this Court deems just and proper.

## COUNT FIVE
### (Violation of New Jersey Wage and Hour Law)

84. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

85. CEC has wrongfully withheld payment of wages, bonus, and other compensation and benefits due and owing from it to Plaintiff, despite Plaintiff's request for same.

86. The acts complained of were performed by and at the direction of Defendant Clancy, who is an officer and/or shareholder of CEC.

87. The deprivation of such compensation earned by Plaintiff constitutes a violation of the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-1 et. seq., and has caused Plaintiff to suffer damages.

88. Under the Wage and Hour Law, Defendants are jointly and severally liable for damages suffered by Plaintiff as a result of the unlawful deprivation of compensation earned by Plaintiff.

89. Defendants' conduct was intentional and/or reckless and, therefore, warrant an award of punitive damages to Plaintiff.

**WHEREFORE** Plaintiff David N.T. Watson demands judgment against Defendants Community Education Centers, Inc. and John J. Clancy, jointly and severally, for all damages, interest, costs of suit, attorneys' fees, punitive damages, and such other relief as this Court deems just and proper.

## COUNT SIX
### (Declaratory Judgment)

90. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 55 hereof as if fully set forth herein at length.

91. The Employment Agreement between CEC and Plaintiff contains terms relating to confidentiality, as well as covenants not to compete with CEC, to interfere with its business relationships, and/or to solicit its clients upon separation from employment.

92. By reason of the foregoing, Plaintiff is entitled to a declaratory judgment against CEC, declaring that CEC is in breach of the Employment Agreement.

93. CEC's breaches of the Employment Agreement excuse Plaintiff from any further performance of obligations thereunder, including but not limited to: i) any obligation to comply with terms relating to confidentiality, as well as covenants not to compete with CEC, interfere with its business relationships, and/or solicit its clients; ii) any obligation to comply with the purported non-compete clause in the Employment Agreement which is, in any event, void and unenforceable as violative of public policy and otherwise an invalid restraint on trade.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court declare his rights under the Employment Agreement, enter an Order specifying the respective rights and obligations of the parties thereunder, and provide such other and further relief the Court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**PECKAR & ABRAMSON, P.C.**
*Attorneys for Plaintiff,*
*David N.T. Watson*
One Southeast Third Avenue, Suite 3100
Miami, FL 33131
Telephone:   305-358-2600
Facsimile:   305-375-0328


By:   /s/ Ralf R. Rodriguez
     Ralf R. Rodriguez, Esq.
     Florida Bar No. 138053